UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


PRECIOUS WAGONER,                                              Case No. 3:14-cv-2063-AC

                            Plaintiff,                         OPINION AND ORDER

            v.

CITY OF PORTLAND, JOEL OCKUNZZI,
and CHRISTOPHER GRYPHON,

                            Defendants.
_____

ACOSTA, Magistrate Judge:

        Pro se plaintiff Precious Wagoner ("Wagoner") brings this civil rights action under 42 U.S.C.

§ 1983 and Oregon law against Defendants City of Portland ("the City"), Joel Ockunzzi

("Ockunzzi"), and Christopher Gryphon ("Gryphon") (collectively, "Defendants"). Ockunzzi and

Gryphon (collectively, "the Officers"), officers of the Portland Police Bureau ("PPB"), arrested

Wagoner in 2012 following a traffic stop. Wagoner asserts fifteen causes of action against the City,

Ockunzzi, and Gryphon, challenging the stop, arrest, use of force during the arrest, detention, and

prosecution. At the core of her claims, Wagoner alleges the stop and arrest were discriminatory and not supported by probable cause. Defendants now move for summary judgment on all of Wagoner's claims. (ECF No. 52.) For the reasons that follow, the court grants Defendants' motion.

*Preliminary Procedural Matters*

## I.  Consideration of Unverified Filings.

In her responses to Defendants' motions, Wagoner did not attest under the penalty of perjury that her factual assertions were true and correct.[1] (ECF Nos. 74, 76, 80.) The court therefore cannot consider Wagoner's responses as evidence for purposes of summary judgment. FED. R. CIV. P. 56(c)(1); *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (attestation under penalty or perjury is prerequisite for considering a pro se plaintiff's motions and pleadings on summary judgment). Accordingly, the court will not consider as evidence Wagoner's factual assertions in her responses to Defendants' motions.

## II.  Motion to Strike.

Wagoner filed an additional response to Defendants' motion after Defendants filed a reply. (ECF No. 76.) Defendants moved to strike Wagoner's second filing as improper under the Federal and Local Rules of Civil Procedure. (ECF No. 77.) In response, Wagoner filed a document replicating portions of her complaint. (ECF No. 80.)

Defendants are correct that Local Rule 7(f)(3) bars briefing beyond one response and one reply on a motion for summary judgment, with an exception not applicable here. Wagoner's

---

[1] The court sent Wagoner a summary-judgment advice notice on August 12, 2016, laying out the evidentiary requirements for opposing a summary-judgment motion. (ECF Nos. 61, 62.) It is unclear whether Wagoner received this notice, due to her failure to notify the court of her changed address, as required by the Local Rules of Civil Procedure. (ECF Nos. 64, 67.)

additional response was procedurally improper. Nonetheless, the court declines to strike Wagoner's additional response. Wagoner is proceeding without the assistance of counsel. Her filings in this case, including her response, the challenged second response, and her response to the motion to strike, total nine pages. Wagoner did not seek to introduce new evidence in her additional briefing, or otherwise cause Defendants undue prejudice. Accordingly, the court exercises its discretion and declines to strike Wagoner's additional response.

## Factual Background

The following statement of facts primarily derives from the evidence submitted by Defendants as part of the motion for summary judgment. In addition to affidavits from Ockunzzi, Gryphon, and other PPB officers, Defendants submitted the transcripts from the bench trials of Wagoner and Beth Lamar ("Lamar") on traffic violation charges. Although Wagoner's Second Amended Complaint ("SAC") (ECF No. 7) is not admissible evidence at this stage of the proceedings, the court references some of its uncontested factual allegations to provide context. *See Moran v. Selig*, 447 F.3d 748, 759–60 (9th Cir. 2006) (a complaint "cannot be considered as evidence at the summary judgment stage because it is unverified").

### A. Initial Traffic Stop

Wagoner and Beth Lamar ("Lamar") attended an event at the Q Center, an LGBTQ[2] organization in north Portland, on November 18, 2012. (SAC ¶ 12.) Ockunzzi and Gryphon were on patrol together, in a "partner car." (Decl. of Joel Ockunzzi ("Ockunzzi Decl.") (ECF No. 54), ¶ 3.) Ockunzzi drove the police car. (*Id.*) Wagoner and Lamar left the event in a Honda Civic driven by Lamar ("the Honda"). (SAC ¶ 12.) Ockunzzi and Gryphon encountered the Honda on

---

[2] LGBTQ is an acronym for Lesbian, Gay, Bisexual, Transgender, and Queer.

Martin Luther King Boulevard ("MLK"). (Ockunzzi Decl. ¶ 4.)  Prior to encountering the Honda on MLK, Ockunzzi and Gryphon had not driven past the Q Center or along the same route as Wagoner and Lamar. (*Id.* ¶ 5, Decl. of Christopher Gryphon ("Gryphon Decl.") (ECF No. 55), ¶ 6; Decl. of Garrett Dow ("Dow Decl.") (ECF No. 56), ¶ 5 & Ex. A.) Ockunzzi observed the Honda make an illegal right turn onto MLK. (Ockunzzi Decl. ¶ 5.) Following behind the Honda, Ockunzzi observed two additional traffic infractions — exceeding the posted speed limit and changing lanes without signalling. (*Id.* ¶¶ 6–7.) Ockunzzi then initiated a traffic stop. (*Id.* ¶ 8.) Lamar pulled over, into a gas station parting lot. (*Id.*) Ockunzzi and Gryphon stopped and approached the Honda on foot. (*Id.* ¶ 8; Gryphon Decl. ¶ 6)

Ockunzzi first approached Lamar, and requested her driver's license, vehicle registration, and proof of insurance. (Ockunzzi Decl. ¶ 9.) Ockunzzi and Gryphon observed Lamar and Wagoner sitting in the Honda without wearing seatbelts. (*Id.* ¶ 9, Gryphon Decl. ¶ 6, Mot. for Summ. J. (ECF No. 52), Ex. 1 ("Lamar Tr."), 4/2–4, Ex. 2 ("Wagoner Tr."), 3/20–24.) Ockunzzi asked for Wagoner's name and date of birth, to write her a citation for not wearing a seatbelt while riding in a moving car. (Ockunzzi Decl. ¶¶ 10–11.) Lamar stated "she's not driving so that's illegal, but it's Precious Lamar." (*Id.* ¶ 10.) Ockunzzi asked Wagoner for her date of birth. (*Id.*) Wagoner replied "I'm not driving, you can't ask me." (*Id.*)

Ockunzzi returned to the police car. (*Id.* ¶ 12.) There, he conducted a database search for the license plate of the Honda and for Lamar's name. (*Id.*) The search returned an oustanding arrest warrant associated with Lamar's name. (*Id.*) The warrant was for Wendy Duffey ("Duffey"). (*Id.*) The search result gave a physical description of Duffey and indicated an association with Lamar. (*Id.*) According to the police database, Duffey had a similar physical build to Wagoner. (*Id.*) Both

Duffey and Wagoner have tattoos on their hands. (*Id.*) Based on the similarities between Duffey's description and Wagoner, Duffey and Wagoner's shared association with Lamar, and Wagoner's refusal to provide identifying information, Ockunzzi believed Wagoner was not "Precious Lamar," but was Duffey. (*Id.* ¶¶ 12–14.)

While Ockunzzi conducted the database search, Gryphon stayed with the Honda. (Gryphon Decl. ¶ 7.) Gryphon approached Lamar's window and began talking with her. (*Id.*) Lamar repeatedly asked why the Officers had stopped the Honda and why Ockunzzi wanted to know Wagoner's name. (*Id.*) Lamar also asserted that the Officers could not lawfully ask about anything other than Lamar's driver's license, the Honda's registration, and liability insurance. (*Id.*) Gryphon asked Wagoner for her name. (*Id.*) Lamar reiterated her belief that Gryphon could not lawfully ask Wagoner for her name. (Wagoner Tr. 12/14–16.) Gryphon responded "I'm speaking to the white male to your right." (*Id.* 12/16–17.) Lamar informed Gryphon that Wagoner was a black woman. (*Id.* 12/22–23.) Ockunzzi returned to the Honda and approached Wagoner's window. (Ockunzzi Decl. ¶ 13.) Again, Ockunzzi asked Wagoner for her name and date of birth. (*Id.*) Wagoner said "You can't fucking ask me that." (*Id.*)

### B. *Wagoner's Arrest.*

Wagoner and the Officers' accounts of her arrest differ. According to Ockunzzi, he informed Wagoner that he needed her name to confirm whether she had an arrest warrant, and also needed the information to fill out a traffic citation. (*Id.*) Wagoner began making exaggerated movements, denied having any identification with her, and continued to assert that Ockunzzi had no right to talk to her. (*Id.* ¶ 14.) In Ockunzzi's experience, Wagoner's conduct was consistent with that of persons attempting to avoid outstanding warrants. (*Id.*). Ockunzzi told Wagoner that he would arrest her

if she did not tell him her name and date of birth. (*Id.* ¶ 15.) Wagoner stated she did not need to identify herself and again refused to give her name. (*Id.*) Ockunzzi repeated that he would arrest Wagoner if she did not identify herself. (*Id.*) Wagoner and Lamar began to yell at one another about whether Wagoner should identify herself. (*Id.*)

Ockunzzi then told Wagoner she was under arrest and told her to place her hands on her head. (*Id.* ¶ 16.) Wagoner shouted that she was not under arrest. (*Id.*) Ockunzzi took hold of Wagoner's hand and began to pull her from the Honda. (*Id.*) Wagoner used her other hand to pull herself back into the car. (*Id.*) Gryphon saw and heard that Wagoner was not cooperating, and moved to the passenger side of the Honda to assist Ockunzzi. (Gryphon Decl. ¶ 9.) The Officers tried together to pull Wagoner from the car. (*Id.* ¶ 10, Ockunzzi Decl. ¶ 16.) Wagoner continued to pull herself into the car. (Ockunzzi Decl. ¶ 16.) Lamar got out of the Honda and began to yell at the Officers. (*Id.*, Gryphon Decl. ¶¶ 10–11.) The confrontation escalated, and Ockunzzi used his radio to call for additional officers. (Ockunzzi Decl. ¶ 16.) Ockunzzi threatened to use pepper spray or a Taser on Wagoner if she continued to resist, but decided against using either. (*Id.* ¶ 17.) Wagoner opposed being pulled from the car by kicking and pulling herself into the car. (*Id.*) Wagoner locked some of the car doors in an attempt to keep the Officers out of the car. (*Id.* ¶ 18.)

The Officers pulled Wagoner out of the car after an additional physical struggle. (*Id.* ¶¶ 18–20.) PPB Officer James Quackenbush ("Quackenbush") arrived in response to Ockunzzi's call for additional officers. (Decl. of James P. Quackenbush ("Quackenbush Decl.") (ECF No. 57), ¶¶ 3–4.) Once out of the Honda, Ockunzzi and Gryphon attempted to handcuff Wagoner. (Ockunzzi Decl. ¶ 20, Gryphon Decl. ¶ 16; Quackenbush Decl. ¶¶ 4, 6.) Wagoner twisted her torso, kicked, and held her arms against her torso while the Officers attempted to handcuff her. (Ockunzzi Decl. ¶ 20,

Gryphon Decl. ¶ 16; Quackenbush Decl. ¶¶ 4, 6.)

In Wagoner's account, Ockunzzi did not inform her of the warrant or his need to issue a traffic citation. (Wagoner Tr. 21/22–22/1.) Instead, Ockunzzi returned to the Honda and asked Wagoner for her name and other information. (*Id.* 21/5–11.) Wagoner told Ockunnzi she did not have to talk to him because she was not driving. (*Id.* 21/9–11.) Ockunzzi and Gryphon continued to pressure Wagoner to identify herself. (*Id.* 21/12–13.) Lamar told the Officers Wagoner's full name, which Wagoner confirmed. (*Id.* 21/13–15.) The Officers then threatened to "mace" Wagoner and began to pull her out of the car. (*Id.* 21/16–19.) She briefly resisted the officers because she did not understand what was happening or why she was being arrested. (*Id.* 21/16–20.) The Officers told her she was under arrest for giving false information. (*Id.* 21/22–23.)

The remaining facts are not in dispute, based on the record before the court. The Officers handcuffed Wagoner while she was prone on the ground. (Ockunzzi Decl. ¶ 20, Gryphon Decl. ¶ 18; Quackenbush Decl. ¶¶ 4, 6.) Ockunzzi searched Wagoner's person, including by lifting her shirt above her waist to check the waistline of her pants for weapons or other contraband. (Ockunzzi Decl. ¶¶ 21–22, Gryphon Decl. ¶ 19.) Wagoner objected loudly to Ockunzzi's search of her person, asserting only a female officer could search a female arrestee. (Ockunzzi Decl. ¶ 21, Gryphon Decl ¶ 19.) During or after the search, Ockunzzi asked Wagoner why she fought the Officers. (Ockunzzi Decl. ¶ 21.) Wagoner stated she did not think the Officers could legally talk to her, and that she had "freaked out" because she did not think she was subject to arrest. (*Id.*) PPB Sergeant Jan Ellertson ("Ellertson"), who arrived as the Officers handcuffed Wagoner, took statements from the Officers and witnesses to the incident. (*Id.* ¶ 23, Ellertson Decl. ¶ 5 & Ex. A.) While still at the scene of the arrest, Ockunzzi issued Wagoner a citation for violating ORS § 811.210 by failing to wear a seatbelt.

*C. Booking and Charges.*

The Officers transported Wagoner to PPB North Precinct ("North Precinct"). (Ockunzzi Decl. ¶ 25.) At North Precinct, the Officers placed Wagoner in a holding cell. (*Id.* ¶ 26.) The holding cell did not contain hazardous materials such as used toilet paper or blood. (*Id.*, Ellertson Decl. ¶¶ 6–7.) In the holding cell, Ockunzzi took three photographs of Wagoner's head and upper torso — one head-on, and one from each side. (Ockunzzi Decl. ¶ 26 & Ex. C.) Ellertson spoke with Wagoner while Wagoner was in the holding cell. (Ellertson Decl. ¶¶ 6, 8.) While talking to Ellertson, Wagoner again stated she had "freaked out" during the stop and her arrest. (*Id.* ¶ 8.) After spending approximately 45 minutes at North Precinct, the Officers transported Wagoner to the Multnomah County Detention Center ("MCDC") for booking. (Ockunzzi Decl. ¶ 27.) Ockunzzi charged Wagoner with violating ORS § 807.620 by using a false name and ORS § 162.315 by resisting arrest. (*Id.* ¶ 27.)

The criminal charges against Wagoner for resisting arrest and using a false name were dismissed at arraignment for an unknown reason. (Multnomah Cnty. Cir. Ct. Register of Actions, MSJ Ex. 4.) At a bench trial, Multnomah County Circuit Judge Stephen Bushong found Wagoner not guilty of the seatbelt violation. (Wagoner Tr. 25:6–7.)

*Legal Standard*

Federal Rule of Civil Procedure ("Rule") 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the "moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must demonstrate its entitlement to summary judgment while "[t]he party opposing the motion is under no obligation to offer affidavits of any other

materials in support of its opposition." *Henry v. Gill Industries, Inc.*, 983 F.2d 943, 949 (9th Cir. 1993).  Nonetheless, if the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Celotex*, 447 U.S. at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

The court's role is not to "weigh the evidence or determine the truth of the matter, but only determine[] whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047 (9th Cir. 1999).  The court must view the inferences drawn from the facts in the light most favorable to the nonmoving party.  *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). The court has an obligation to review the sufficiency of a motion for summary judgment and supporting evidence, even if the non-moving party does not submit a response supported by evidence.  *In re Rogstad*, 126 F.3d 1224, 1227 (9th Cir. 1997).

*Analysis*

Wagoner's claims challenge the entirety of Ockunzzi and Gryphon's encounter with her and Lamar — from the initial traffic stop to her post-arrest detention.

Defendants submitted six affidavits in support of their motion for summary judgment, accompanied by documentary evidence.  Wagoner submitted images of two documents apparently associated with her criminal charges and traffic violation from the incident.  The transcripts of Wagoner and Lamar's bench trials are properly authenticated by the court reporter, and thus appropriate to consider as evidence.  FED. R. CIV. P. 80(c); *Orr v. U.S. Bank, NT & SA*, 285 F.3d 764, 777 (9th Cir. 2002) (applying Rule 80(c) to trial transcripts from state court).

<u>I.  Tort Claims under Oregon law</u>.

Wagoner brings the following tort claims under Oregon law: wrongful arrest, two separate assault claims, battery, negligence, false imprisonment, malicious prosecution, and wrongful use of civil proceedings.  Under the Oregon Tort Claims Act, actions against public employees for torts committed in the course of employment must be brought against the public body.  OR. REV. STAT. § 30.265(2).  Wagoner's state-law claims are therefore against the City, based on Ockunzzi and Gryphon's conduct during the course of their employment.  The City seeks summary judgment on all of Wagoner's state-law claims as either unsupported by the record or negated by probable cause.

*A.  False Arrest and Imprisonment.*

Wagoner asserts claims for wrongful arrest and imprisonment, arguing she was handcuffed, arrested, and taken into police custody without a warrant or probable cause.  Wrongful arrest and wrongful imprisonment have the same elements under Oregon law.  *Hiber v. Creditors Collection Serv.*, 154 Or. App. 408, 413 (1998) (citing *Lucas v. J.C. Penny Co.*, 233 Or. 345, 353 (1963)).  Claims for wrongful arrest and wrongful imprisonment may challenge different aspects of an individual's arrest and detention.  *Fossen v. Clackamas County*, 271 Or. App. 842, 847–48 (2015) (false arrest claim challenged initial arrest; wrongful imprisonment challenged detention after initial arrest).  Under Oregon law, the elements of false arrest are: "(1) the tortfeasor must confine the plaintiff; (2) the tortfeasor must intend the act that causes the confinement; (3) the plaintiff must be aware of the confinement; and (4) the confinement must be unlawful."  *Singh v. McLaughlin*, 255 Or. App. 340, 348 (2013) (citing *Hiber*, 154 Or. App. at 413).  "The gravamen of the claim is 'the unlawful imposition of restraint on another's freedom of movement."  *Id.* (citing *Hiber*, 154 Or. App. at 413).  Initially lawful confinement may become unlawful if the confinement continues after

"officers exhaust[] their authority to detain" a person.  *Walker v. City of Portland*, 71 Or. App. 693, 699 (1985).

Here, Wagoner asserts a false arrest claim based on her initial arrest at the Chevron.  (SAC ¶¶ 41–42.)  Her false imprisonment claim arises from her transportation from the scene and four-hour detention.  (*Id.* ¶¶ 43–44.)  The City contests only the fourth element of both claims: whether Wagoner's confinement was unlawful.  (MSJ at 12–18.)  Accordingly, the court must determine whether the Officers lawfully arrested and detained Wagoner.

The asserted legal basis for the Officers' restraint on Wagoner's freedom of movement shifted during Wagoner's encounter with the Officers.  Wagoner was initially detained under the Officers' authority to investigate her alleged traffic violation of not wearing a seatbelt, and to identify her to issue a citation for the violation.  Before the Officers completed the investigative stop, Ockunzzi told Wagoner she was under arrest.  Wagoner then physically resisted Ockunzzi's attempts to arrest her, leading the Officers to take Wagoner into custody for resisting arrest.  The court must determine whether the Officers had legal authority for each of the three impositions of restraint on Wagoner's freedom of movement.

Wagoner argues she is innocent of all charges previously filed against her, including the seat belt violation, using a false name, and resisting arrest.  As an initial matter, the court notes guilt and probable cause are materially different standards.  The City need not prove that Wagoner is guilty of the offenses with which she was charged.  Instead, in this civil lawsuit, the City need only establish a legal justification for its actions — reasonable suspicion or probable cause, depending on the context.  The standard for justifying an arrest is a lower evidentiary burden than establishing guilt beyond a reasonable doubt.  *State v. Gibson*, 268 Or. App. 428, 431–52 (2015) ("Probable cause

is not certainty; 'there is a vast difference between proof of probable cause and proof of guilt.'") (quoting *State v. Tacker*, 241 Or. 597, 601 (1965)).

*1. Traffic Stop and Investigative Detention.*

The City first argues the Officers lawfully detained Wagoner to issue a citation for failing to wear a seatbelt. The court agrees. Oregon law allows police officers to "stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation." OR. REV. STAT. § 810.410(3)(b). An officer must have probable cause to stop and detain a person for a suspected traffic violation. Under Oregon law, probable cause has objective and subjective components. *State v. Stookey*, 255 Or. App. 489, 491 (2013). "First, at the time of the stop, the officer must subjectively believe that a violation has occurred, and second, that belief must be objectively reasonable under the circumstances." *Id.* (citing *State v. Miller*, 345 Or. 176, 186 (2008)).

The Officers had probable cause to stop the Honda and detain Wagoner to issue a citation. First, The Officers' unrebutted testimony establishes that they observed Lamar commit multiple traffic violations. (Lamar Tr. 3/5–17; Ockunzzi Decl. ¶¶ 6–7; Gryphon Decl. ¶ 4.) Because they believed Lamar committed multiple traffic violations, the Officers had probable cause to stop the Honda. OR. REV. STAT. § 810.410(2)(a); *Stookey*, 255 Or. App. at 491. The Officers' unrebutted testimony also shows that they saw Wagoner not wearing a seatbelt in the Honda, immediately after the Honda left the public street. (Lamar Tr. 4/3–4; Wagoner Tr. 17/9–25; Ockunzzi Decl. ¶ 9; Gryphon Decl. ¶ 6.) It was objectively reasonable to believe that Wagoner had not been wearing a seatbelt while the car was moving, violating ORS § 811.210. (*See* Wagoner Tr. 24/18–25/1 (Judge Bushong reaching same conclusion)). Accordingly, the Officers had lawful authority to detain

Wagoner to identify her and issue a citation.

    *2. Initial Arrest.*

The Officers' restraint on Wagoner's liberty escalated when Ockunzzi told Wagoner she was "under arrest" and directed her to place her hands on her head. (Ockunzzi Decl. ¶ 16.) Here, the City argues Ockunzzi lawfully detained Wagoner to cite her for failing to wear a seatbelt and to determine whether she was subject to the Duffey warrant. (MSJ at 17.) The City then argues Wagoner's subsequent physical resistance gave Ockunzzi probable cause to arrest her for resisting arrest. (*Id.* at 16–17.)

The city's argument is inconsistent with the elements of resisting arrest and the factual record. Under ORS § 162.315(2)(a), "arrest" is defined by reference to ORS § 133.005(1), which expressly states investigative stops are not arrests. If Wagoner was detained only as part of an investigative stop prior to her acts of physical resistance, her subsequent arrest for resisting arrest lacked legal justification. The City's "detention" argument is also inconsistent with Ockunzzi's account of the incident. (Ockunzzi Decl. ¶ 16 (stating Ockunzzi told Wagoner "she was under arrest").) Even if Wagoner was lawfully arrested for resisting arrest, the City still must establish lawful authority for Wagoner's initial arrest to achieve summary judgment on the entirety of Wagoner's wrongful arrest claim. Accordingly, the court must determine whether Oregon law allowed Ockunzzi to arrest Wagoner before she began to resist.

First, the City's proffered reasons for Wagoner's initial "detention" do not justify her arrest. The City argues Ockunzzi had lawful authority to detain Wagoner to determine whether she was subject to the Duffey warrant and to identify her to issue a traffic citation for failing to wear a seatbelt. But the Duffey warrant did not allow Ockunzzi to arrest Wagoner. An arrest warrant only

authorizes the arrest of the subject of the warrant. *State v. Johnson*, 120 Or. App. 151, 156 (1993). Arresting a person under a warrant for another person is unlawful, even if done in good faith. *Id.* at 157 (citing *Pierson v. Multnomah County*, 310 Or. 48, 55 (1986)).

Oregon law also does not allow a police officer to arrest a passenger for identification purposes during a traffic stop. Under ORS § 810.410(3)(a–b), an officer has authority to detain a person to identify the person and issue a traffic citation, but lacks authority to arrest a person for a traffic violation. The City nonetheless argues the arrest was justified by Wagoner's refusal to identify herself for the purposes of the citation, relying on the following quotation: "[W]hen an officer subjects a person to a traffic stop, the officer has gained the authority to impose negative consequences — further detention or arrest — if the person refuses to respond to a request for identification." *State v. Suppah*, 264 Or. App. 510, 527 (2014) (en banc), *rev'd on other grounds*, 358 Or. 565 (2016). The context of the quotation from *Suppah* requires a different conclusion. The sentence preceding the quotation discusses a driver's obligations during a traffic stop. *Id.* at 526 ("If, for example, a driver does not provide identification to an officer . . . ."). *Suppah* involved a driver who was stopped by police and gave a false name. *Id.* at 513. Failing to present a driver's license during a traffic stop is a misdemeanor. OR. REV. STAT. § 807.570(1)(b)(A), (5). An officer therefore could arrest without a warrant a driver who refuses to identify themselves. *See* OR. REV. STAT. § 133.310(1)(b) (authorizing warrantless arrests for misdemeanors). No such statute applies to passengers. *Suppah* therefore does not provide a basis for arresting a passenger who refuses to identify herself during a traffic stop.

Accordingly, neither the Duffey warrant nor Wagoner's refusal to identify herself provide a legal basis for arresting Wagoner. Ockunzzi's arrest of Wagoner was lawful only if he had

probable cause to arrest her for an offense other than a traffic violation. OR. CONST. art. I, § 9; OR. REV. STAT. § 133.310(1). Under Oregon law, probable cause has statutory and constitutional dimensions. Probable cause requires "a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." OR. REV. STAT. § 31.005(11). Constitutionally, probable cause has both subjective and objective components. "[T]he subjective component of the probable cause inquiry is satisfied if the officer believes that he or she has lawful authority to restrain the individual's liberty." *Miller*, 345 Or. at 185. The objective component requires that the officer be aware of facts supporting an objectively reasonable conclusion that probable cause exists. *Id.* at 188. Probable cause may exist even if the officer had a different, incorrect subjective belief that she could arrest the person, so long as the officer was aware of facts objectively sufficient to establish probable cause. *Id.* at 185.

The court concludes Wagoner's initial arrest was lawful because Ockunzzi had probable cause to arrest Wagoner for using a false name. Ockunzzi's declaration states he subjectively believed he had the authority to arrest Wagoner based on the Duffey warrant and her refusal to provide her name. (Ockunzzi Decl. ¶¶ 14, 16.) So long as Ockunzzi was aware of facts providing an objectively reasonable basis for probable cause to arrest Wagoner, the arrest was lawful. *Miller*, 345 Or. at 185, 188. The undisputed facts in the record show Ockunzzi was aware of facts allowing an objectively reasonable conclusion that Wagoner committed a misdemeanor by using the false name Lamar provided for Wagoner, in violation of ORS § 807.620.

The statute provides: "A person commits the offense of giving false information to a police officer if the person knowingly uses or gives a false or fictitious name, address or date of birth to any police officer who is enforcing motor vehicle laws." OR. REV. STAT. § 807.620(1). Ockunzzi was

aware of facts allowing a reasonable conclusion that, more likely than not, Wagoner had violated

ORS § 807.620(1). First, Ockunzzi could reasonably conclude Wagoner knew he was a police

officer enforcing motor vehicle laws. Ockunzzi was wearing a police uniform, displaying his badge,

and driving a marked patrol car. (Lamar Tr. 2/25–3/1.) He previously told Lamar and Wagoner that

they were both being stopped for, among other things, failure to wear seatbelts. (Ockunzzi Decl. ¶

9.)

Second, Ockunzzi could reasonably conclude Wagoner's name was not "Precious Lamar."

Upon searching his police database, Ockunzzi discovered an arrest warrant for Duffey, a person

associated with Lamar who roughly matched Wagoner's description.[3] (*Id.* ¶ 12.) Wagoner's

responses to Ockunzzi's renewed requests for her name and date of birth were, in Ockunzzi's

experience, consistent with the behavior of a person trying to conceal their identity to avoid an arrest

warrant. (*Id.* ¶ 14.) In totality, the facts as Ockunzzi perceived them allowed a reasonable

conclusion that Wagoner was Duffey. It is irrelevant to the probable cause analysis that Wagoner

is, obviously, not Duffey. *See State v. Isley*, 182 Or. App. 186, 190 (2002) (probable cause may be

based on an incorrect conclusion, so long as the conclusion is objectively reasonable).

Third, Ockunzzi could reasonably conclude Wagoner had "used" the incorrect name Lamar

provided. "Use" has no statutory definition and has not been construed by Oregon courts. *But see*

*State v. Suppah*, 358 Or. 565, 567 (2016) (giving a false name); *State v. Bishop*, 157 Or. App. 33,

---

[3] The City also argues Ockunnzi also searched for the name "Precious Lamar" and found no corresponding record. Viewing the record in the light most favorable to Wagoner, the court cannot accept this characterization of the evidence. The City's citation to the Lamar Hearing Transcript refers to Ockunzzi's testimony that he "was unable to get a date of birth" for the incorrect name. (Lamar Tr. 4/10–12.) This statement could refer to a database search or to Wagoner's refusal to provide her date of birth. (*See* Ockunzzi Decl. ¶ 10.) Ockunzzi's declaration states he searched for the license plate and "Lamar's (the driver's) name." (*Id.* ¶ 11.)

35 (1998) (same); *State v. Robinson*, 107 Or. App. 410, 412 (1991) (same). Two Oregon rules of statutory interpretation are instructive, however. First, interpreting an Oregon statute begins with the text and context of the statute. *State v. Gaines*, 346 Or. 160, 171 (2009). When a statutory term is not defined in the statute, Oregon courts apply a word's "ordinary meaning," using a dictionary definition. *Potter v. Schlesser Co.*, 335 Or. 209, 213 (2003). Second, Oregon courts must give effect to all terms and provisions of a statute. *Vsetecka v. Safeway Stores, Inc.*, 337 Or. 502, at 510 (2004) (citing ORS § 174.010); *Godfrey v. Fred Meyer Stores*, 202 Or. App. 673, 682 (2005).

Within this analytical framework, the court concludes "us[ing] a false or fictitious name" includes failing to correct a false name given by another. First, the dictionary definition of "use" generally connotes employing or relying on something to achieve a goal. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (unabridged ed. 1993) (definitions include "to put into action or service," "have recourse to or employment of," "to make instrumental to an end or process," and "carry out a purpose or action by means of.") . Second, "use" appears in parallel with "give." OR. REV. STAT. § 810.620(1). To give effect to all words in the statute, "use" must mean something different than "give." *See Godfrey*, 202 Or. App. at 682 ("Ordinarily, we are constrained to construe statutes to avoid such potential redundancies."). Giving a false name generally involves affirmatively providing a false name to a police officer. *See, e.g.*, *Suppah*, 358 Or. at 567 (stating a false name); *Robinson*, 107 Or. App. at 412 (stating a false name and providing a document containing a false name). To give effect to all terms in the statute, "use" must mean something different from "give." *Godfrey*, 202 Or. App. at 682. Accordingly, a person "uses" a false name in violation of ORS § 810.620 when the person employs or relies on a false name other than by affirmatively providing the false name.

The facts, as Ockunzzi perceived them, allowed a reasonable conclusion that Wagoner had used a false name by relying on the false name Lamar provided. In response to Ockunzzi's inquiry, Lamar identified Wagoner as "Precious Lamar." (Ockunzzi Decl. ¶ 10.) Wagoner proceeded with the interaction without correcting the false name. (*Id.*) The totality of the circumstances also allowed a reasonable conclusion that, more likely than not, Wagoner did so knowingly. Wagoner argues she did not intend to give a false name, but probable cause does not require proof of mental state. *See Gibson*, 268 Or. App. at 431–52. The facts as Ockunzzi perceived them — especially Ockunzzi's perception that Wagoner was attempting to avoid a warrant — were enough to allow a reasonable conclusion that Wagoner acted with the required mental state.

Ockunzzi therefore had probable cause to arrest Wagoner for using a false name, under ORS § 807.620. Because using a false name is a misdemeanor, Ockunzzi had lawful authority to arrest Wagoner without a warrant. OR. REV. STAT. § 133.310. Accordingly, Ockunzzi lawfully arrested Wagoner before he attempted to pull her from the car. *See Miller*, 345 Or. at 186 (arrest remains valid where objective basis for probable cause existed, even if subjective basis for arrest was improper).

Wagoner's arguments regarding providing false information do not change the court's analysis. Wagoner argues the appearance of her correct name on the citation and other documents shows she provided her name to the Officers later. (Resp. (ECF No. 74) at 1 & Exs. 1, 3.) She also testified during her bench trial that Lamar correctly identified Wagoner after Ockunzzi returned to the Honda, and was "pressuring" her to identify herself. (Wagoner Tr. 21/12–16.) But neither of these contentions disturb the court's conclusion that probable cause was present. The conduct creating probable cause for Wagoner's arrest occurred before the Officers filled out the documents

Wagoner offers, and before Ockunzzi returned to the Honda after searching the police database. Wagoner's subsequent correct identification of herself does not nullify her prior conduct.

### 3. Resisting Arrest.

Wagoner was also arrested for resisting arrest, a misdemeanor under ORS § 162.315. Section 315 provides: "A person commits the crime of resisting arrest if the person intentionally resists a person known by the person to be a peace officer or parole and probation officer in making an arrest." "Resists" is defined as "the use or threatened use of violence, physical force or any other means that creates a substantial risk of physical injury to any person and includes, but is not limited to, behavior clearly intended to prevent being taken into custody by overcoming the actions of the arresting officer." OR. REV. STAT. § 162.315(2)(a, c). "Resist" excludes passive resistance. *Id.* § 162.325(2)(c).

The court concludes the Officers had probable cause to arrest Wagoner for resisting arrest. The City provides declarations from Ockunzzi, Gryphon, and Quackenbush which describe Wagoner's conduct during her arrest. Wagoner's actions included kicking, twisting her torso, and pulling her arms against her torso to avoid being handcuffed. (Ockunzzi Decl. ¶¶ 17–18, 20; Gryphon Decl. ¶ 16; Quacknbush Decl. ¶ 4.) While Wagoner disputes that she resisted arrest, she does not offer admissible evidence controverting the City's evidence. (*See* Resp. at 1.) Even if the court considered Wagoner's unsworn response as a declaration, her statement contests her mental state, not her actions. (*Id.* ("Oregon law states you have to be aware and comprehend what is going on to be considered [r]esisting arres[t].")) But the City does not need to prove Wagoner's mental state to establish probable cause. *Gibson*, 268 Or. App. at 431–52. The facts as the Officers perceived them allowed an objectively reasonable conclusion that Wagoner knew she was being

arrested, and knew that the Officers were police officers. Moreover, Wagoner testified under oath at her bench trial that she "did resist for a second." (Wagoner Tr. 21/19.) The record does not allow a reasonable dispute of fact regarding Wagoner's initial physical resistance to being arrested. Accordingly, the Officers also had probable cause to arrest Wagoner for resisting arrest.

In sum, the City establishes that all restraints placed on Wagoner's liberty, from the initial traffic stop to her transportation to North Precinct and MCDC, were lawful. The Officers had probable cause to initially detain Wagoner to issue a citation, and later had probable cause to arrest her for using a false name and resisting arrest. Accordingly, Wagoner cannot establish an essential element of her wrongful arrest claim. The City is entitled to summary judgment on Wagoner's first and second claims.

### B. Assault and Battery.

Wagoner's third and fourth claims are state-law claims for assault and battery, brought against the City. "[A]n assault is an intentional attempt by force to do violence to the person of another, and a 'battery is the actual application to such person of the attempted force and violence.'" *Cook v. Kinzua Pine Mills Co.*, 207 Or. 34, 47 (1956) (quoting *Stark v. Epler*, 59 Or. 262, 267 (1911)). Wagoner asserts assault and battery claims for the force the Officers used in arresting her, and assault for being placed in a contaminated holding cell. The City seeks summary judgment on the assault and battery claims. First, the City argues the Officers were privileged in using force on Wagoner to effectuate her arrest. Second, the City contends the record shows Wagoner was not placed in a contaminated holding cell.

A police officer has a complete defense to civil liability for assault or battery if the officer used force as authorized by statute. *Gigler v. City of Klamath Falls*, 21 Or. App. 753, 763 (1975).

An officer may use force "when and to the extent that the peace officer reasonably believes it necessary [t]o make an arrest . . . unless the peace officer knows that the arrest is unlawful." OR. REV. STAT. § 161.235(1). The record shows the Officers pulled Wagoner out of the car and forced her to a prone position on the ground. Ockunzzi was justified in pulling Wagoner out of the car because she refused to submit to arrest, and physically resisted the Officers' attempts to remove her from the car. The record does not disclose any evidence that the Officers used force beyond the force necessary to remove Wagoner from the car and place her in handcuffs. The City is therefore entitled to summary judgment on Wagoner's first assault claim and battery claim because the Officers used force as authorized by ORS § 161.235(1).

The City seeks summary judgment on Wagoner's second assault claim as a factual matter. In her second assault claim, Wagoner alleges the Officers placed her in a holding cell with blood on the walls and used toilet paper strewn around the cell. Wagoner argues the Officers or other PPB officers attempted by cause harmful or offensive physical contact with Wagoner by placing her in a cell with hazardous materials. The City submits declarations showing the holding cell did not contain blood or used toilet paper. (Ockunzzi Decl. ¶ 26; Ellertson Decl. ¶¶ 6–7.) Wagoner submitted nothing in response. Accordingly, the City is entitled to summary judgment on Wagoner's second assault claim because Wagoner failed to establish the presence of hazardous materials in the holding cell. *See Celotex*, 477 U.S. at 322–23.

*C. Malicious Prosecution*

Wagoner asserts a claim for malicious prosecution, based on the criminal charges against Wagoner under ORS § 807.620 for giving false information to a police officer. The elements of malicious prosecution are:

> "(1) the institution or continuation of the original criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceeding; and (6) injury or damage because of the prosecution."

*Blandino v. Fischel,* 179 Or. App. 185, 190 (quoting *Rose v. Whitbeck,* 277 Or. 791, 795 *modified on other grounds,* 278 Or. 463 (1977).  As discussed above, the Officers had probable cause to arrest Wagoner under ORS § 807.620 because the Officers reasonably believed Wagoner "used" a false name by acquiescing to the incorrect name Lamar provided.  The existence of probable cause negates an element of Wagoner's claim. *Blandino*, 179 Or. App. at 190.  Accordingly, the City is entitled to summary judgment on Wagoner's malicious prosecution claim.

### D.  Wrongful Initiation of Civil Proceedings

Wagoner also asserts a claim for wrongful initiation of civil proceedings.  Her wrongful initiation claim is based on her citation for not wearing a seatbelt in violation of ORS § 811.210. The elements of wrongful initiation of civil proceedings are similar to those of malicious prosecution:

> (1) The commencement and prosecution by the defendant of a judicial proceeding against the plaintiff; (2) The termination of the proceeding in the plaintiff's favor; (3) The absence of probable cause to prosecute the action; (4) The existence of malice, or as is sometimes stated, the existence of a primary purpose other than that of securing an adjudication of the claim; and (5) Damages.

*Alvarez v. Retail Credit Ass'n of Portland, Or., Inc.,* 234 Or. 255, 259–60 (1963).  The City moves for summary judgment on this claim, arguing the Officers had probable cause to cite Wagoner for failing to wear a seatbelt because they observed Wagoner without a seatbelt after the car was stopped.  Wagoner contends her acquittal at a bench trial on the citation eliminates probable cause. The court disagrees.  Circuit Court Judge Bushong concluded on the record at Wagoner's bench trial that the Officers had probable cause to issue the citation, based on the Officers' observations once

the car stopped.  (Wagoner Tr. 24/18–25/1.)   As this court previously concluded, the Officers had probable cause to cite Wagoner for violation of ORS § 811.210.  The existence of probable cause is dispositive of Wagoner's wrongful initiation of civil proceedings claim.  *Alvarez*, 235 Or. at 259–50.  The City is therefore entitled to summary judgment on Wagoner's wrongful initiation of civil proceedings claim.

### E.  Negligence

Wagoner also alleges a negligence claim based on the Officers' conduct in arresting her.  She alleges the Officers "negligently caused her to chip her tooth and caused bruising and swelling to her wrists" when handcuffing her.  The City advances multiple arguments against Wagoner's negligence claim, but one argument is dispositive of the negligence claim.  Courts in this District consistently reject negligence claims at the summary judgment stage when the negligence claim is based on the same facts as claims under 42 U.S.C. § 1983 or an intentional tort.  *E.g. Woods v. Gutierrez*, No. 3:11-cv-1082-BR, 2012 WL 6203170, at *4 (D. Or. Dec. 12, 2012) (facts supporting § 1983 claim cannot also support negligence claim); *Whitfield v. Tri-Metropolitan Transp. Dist.*, No. 06-1644-HA, 2009 WL 839484, at *11 (D. Or. Mar. 30, 2009) (same).  Similarly, intentional conduct, such as arresting and handcuffing a person, cannot support a claim for negligence.  *Woods*, 2012 WL 6203170, at *12 (arresting and handcuffing person was intentional conduct that could not support a negligence claim); *Kasnick v. Cooke*, 116 Or. App. 580, 583 (1992) (evidence of intentional conduct cannot give rise to a negligence claim).  Accordingly, the City is entitled to summary judgment on Wagoner's negligence claim.

### F.  Intentional Infliction of Emotional Distress

Wagoner's final state-law cause of action is for intentional infliction of emotional distress.

Her complaint alleges two separate instances as grounds for the tort: being placed in a holding cell with hazardous materials, and Ockunzzi taking photographs of Wagoner in the holding cell with their cell phones while she was crying. Intentional infliction of emotional distress ("IIED") requires proof of the following elements: "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct." *Sheets v. Knight*, 308 Or. 220, 236 (1989). The relationship between a plaintiff and defendant bears on the third element of IIED. *McGanty v. Staudenraus*, 321 Or. 352, 543–51 (1995)(overruling prior cases considering the relationship under the first element). The City seeks summary judgment on Wagoner's first IIED claim because Wagoner has not shown a genuine issue of material fact regarding the presence of hazardous materials in the holding cell. For the reasons previously stated regarding the assault claim, the court agrees there is no genuine issue of material fact about the presence of used toilet paper and smeared blood in the holding cell. The City is entitled to summary judgment on Wagoner's first IIED claim.

The City next argues Ockunzzi did not intend to cause Wagoner severe emotional distress when he took her picture in the holding cell. By focusing on intent, the City misplaces its argument. *McCanty* held that intent includes knowledge that severe emotional distress "is certain, or substantially certain, to result from [a defendant's] conduct." 321 Or. at 550. Wagoner needs to show only that Ockunzzi was substantially certain that photographing her while crying, handcuffed, and in a holding cell would cause severe emotional distress.

Nonetheless, Ockunzzi's purpose in taking the picture and the context of their interaction is relevant to the third element: whether the act was an "extraordinary transgression of the bounds of

socially tolerable behavior." *Sheets*, 308 Or. At 236. "Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law." *Harris v. Pameco Corp.*, 170 Or.App. 164, 171 (2000). The court considers "the purpose of the conduct and the means used to achieve the result." *Shay v. Paulson*, 131 Or. App. 270, 273 (1994). Behavior is considered within its context, meaning ordinarily unpleasant and unacceptable conduct may be typical under unusual circumstances. *Hetfield v. Bostwick*, 136 Or. App. 305, 310–11 (1995) (a former spouse's attempts to estrange her former husband from their children was not an "extraordinary transgression" of social norms, in the context of family discord).

The record on summary judgment shows Ockunzzi used his PPB-issued cellular phone to take three photographs of Wagoner, showing her face and upper body head-on and from each side. (Ockunzzi Decl. ¶ 26 & Ex. C.) Ockunzzi represents that his intent in taking Wagoner's picture in the holding cell was to "document [the] physical condition of Wagoner since [the Officers] used force." (*Id.* ¶ 26.) A PPB "After Action Report" references the photographs, and suggests taking photographs of a person after a police use-of-force was part of PPB policy. (Ellertson Decl., Ex. A at 3.) Wagoner does not introduce any evidence contradicting Ockunzzi's stated purpose or showing Ockunzzi or Gryphon made improper comments or otherwise behaved inappropriately while taking photographs of her.

The evidence in the record does not disclose "an extraordinary transgression" of social norms. Being photographed while crying might be extreme behavior under ordinary circumstances. But when in police custody after a physical altercation with officers, being photographed is not "outrageous in the extreme." *See Hetfield*, 136 Or. App. at 310–11 (holding that, when unusual and unpleasant conduct is common under specific circumstances, such conduct is not outrageous in the

extreme). Photographing a person following their arrest is sufficiently common that documenting her physical condition was not an "extraordinary transgression of the bounds of socially tolerable conduct" under the specific circumstances of this case. *Id.*

II. Federal Constitutional Claims under Section 1983.

Wagoner brings multiple claims under 42 U.S.C. § 1983, alleging constitutional violations in her arrest and detention. The § 1983 claims are against Ockunzzi and Gryphon as individuals. The Officers seek summary judgment on all of Wagoner's claims.

    *A. Fourth Amendment Violation in Wagoner's Arrest.*

Wagoner first alleges a violation of the Fourth Amendment to the U.S. Constitution based on her initial handcuffing and arrest. She claims the Officers arrested her without probable cause. The Officers seek summary judgment on this claim because the Officers had probable cause to arrest Wagoner. An arrest is constitutional if supported by probable cause, even if state law does not authorize arrest for that offense. *Virginia v. Moore*, 553 U.S. 164, 176 (2008). Probable cause under the Fourth Amendment exists if "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Lopez*, 482 F.3d 1067, 1071 (9th Cir. 2007) (alteration in original) (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th Cir.1986)). Probable cause is an objective standard. *Id.*

Ockunzzi and Gryphon are entitled to summary judgment on Wagoner's Fourth Amendment claim arising from her arrest. Even before the Officers had probable cause to arrest Wagoner for using a false name and resisting arrest, the Officers had probable cause to believe Wagoner committed a violation under ORS § 811.210, for the reasons previously stated. Probable cause to

believe Wagoner committed a violation defeats her Fourth Amendment claim based on her arrest.

A court in this district analyzed an arrest under analogous circumstances in *Miller v. City of Portland*, No. 3:11-cv-1509-JE, 2014 WL 320555 (D. Or. Jan. 29, 2014). In *Miller*, the court considered a Fourth Amendment claim arising from a man's arrest for jaywalking. *Id.* at *2–3. Jaywalking and failing to wear a seatbelt are both violations under Oregon law. OR. REV. STAT. §§ 811.210 (failure to wear a seatbelt); 814.020 (failure to obey pedestrian traffic control device). The plaintiff in *Miller* alleged an unconstitutional arrest under the Fourth Amendment, because Oregon law prohibits arrest for traffic violations. *Miller*, 2014 WL 320555, at *5 (citing OR. REV. STAT. § 810.410). The court concluded the plaintiff's arrest was constitutional because the officer observed the plaintiff committing a traffic violation, even though the officer gave a different subjective reason for the arrest. *Id.* at *9–10 (citing *Moore*).

As in *Miller*, Wagoner's arrest was constitutional based on the seatbelt violation alone. The officers reasonably believed there was a "fair probability" that Wagoner had violated ORS § 811.210 by failing to wear a seatbelt while the Honda was moving, as discussed *supra* in addressing Wagoner's wrongful initiation claim. *Lopez*, 482 F.3d at 1071. Although the Officers had a different subjective reason for initiating Wagoner's arrest, they were aware of facts creating probable cause that Wagoner violated ORS § 811.210. *Miller*, 2014 WL 320555, at *10 (citing *Devenpeck v. Alford*, 543 U.S. 146, 152–54 (2004). Accordingly, Wagoner's arrest did not violate the Fourth Amendment.

### B. Fourth Amendment Violation through Excessive Force.

Wagoner also alleges the Officers used unconstitutionally excessive force in arresting her when they took her to the ground, causing her face to contact the pavement and chipping a tooth.

Claims for excessive force during an arrest or investigatory stop arise under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Under *Graham*, the court balances "the nature and quality" of the force with the government's interest in "(1) how serious the crime is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest." *Mattos v. Agarano*, 661 F.3d 433, 441 (2011). The court analyzes the reasonableness of the use of force "from the perspective of a reasonable officers on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Construed in the light most favorable to Wagoner, these are the facts relating to the Officer's use of force: Wagoner had been uncooperative with the Officers throughout the stop. (Ockunzzi Decl. ¶¶ 10, 13–16; Gryphon Decl. ¶ 9.) Ockunzzi suspected Wagoner was Duffey, the subject of an outstanding arrest warrant. (Ockunzzi Decl. ¶¶ 12, 14.) Wagoner did not place her hands on her head as ordered, so Ockunzzi attempted to pull her from the car. (Ockunzzi Decl. ¶ 16; Gryphon Decl. ¶¶ 9–10.) Wagoner did not realize Ockunzzi was arresting her, and briefly resisted the Officers' efforts to pull her from the car. (Wagoner Tr. 21/16–20.) The Officers removed Wagoner from the car after she stopped resisting. (Ockunzzi Decl. ¶ 20; Gryphon Decl. ¶ 15.) After pulling Wagoner out of the car, the Officers forced her to the ground. (Ockunzzi Decl. ¶ 20; Gryphon Decl. ¶ 18.) Wagoner experienced wrist and back pain after the incident. (MSJ, Exs. 5, 6.)

The court first considers the "nature and quality of the force" and the resulting intrusion on Wagoner's Fourth Amendment rights. *Mattos*, 661 F.3d at 441. The Officers pulled on Wagoner's limbs to remover her from the car, and forced her to the ground once outside of the car. The Officers did not use pepper spray, a Taser, batons, or other weapons. There is no evidence that the Officers

punched, kicked, or otherwise struck Wagoner. There is also no evidence in the record supporting Wagoner's allegation that she chipped a tooth during the encounter. In sum, the Officers used a minimal amount of force, resulting in a lesser intrusion on Wagoner's Fourth Amendment rights.

Next, the court considers the severity of the crime at issue. *Graham*, 490 U.S. at 396. Here, the crime at issue was giving false information. The Officers also had reason to believe Wagoner was subject to the Duffey warrant, but the record does not state what offense or offenses gave rise to the Duffey warrant. Accordingly, the only crime at issue, based on the record before the court, was of minimal severity.

The court also considers whether Wagoner "posed an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. Here, Wagoner's physical resistance to being arrested — however brief — posed some risk of injury to the Officers. Wagoner's initial resistance included kicking at Ockunzzi. (Ockunzzi Decl. ¶ 17.) Accordingly, Wagoner posed at least a risk of minor injury to the Officers.

The final *Graham* factor is whether Wagoner was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Wagoner's physical resistance to her arrest is undisputed, although the parties disagree about the duration of her resistance. (*See* Wagoner Tr. 21/19; Ockunzzi Decl. ¶¶ 16–20; Gryphon Decl. ¶¶ 10–18.) The Officers' use of force during the undisputed period of resistance — pulling on Wagoner's limbs to remove her from the car — was objectively reasonable under the circumstances. The Officers used the least intrusive means of force to overcome Wagoner's unlawful resistance to her arrest. For summary judgment purposes, the court must credit Wagoner's statement that her resistance was brief , meaning she stopped resisting prior to being taken to the ground. But even then, the Officers' use of force was reasonable, based

on the circumstances as the Officers perceived them.

Ockunzzi reasonably believed Wagoner was subject to and trying to avoid the Duffey warrant. Wagoner had been uncooperative during the entire stop. Under these circumstances, taking Wagoner to the ground to handcuff her was an objectively reasonable way to complete her arrest without further struggle. The record on summary judgment does not support Wagoner's claim that the Officers "bashed" her head into the ground, or otherwise used more force than was necessary to put Wagoner in a prone position. The amount of force supported by the record before the court was objectively reasonable, in light of the minimal amount of force used and Wagoner's active resistance to arrest. *See Graham*, 490 U.S. at 396. Accordingly, Ockunzzi and Gryphon are entitled to summary judgment on Wagoner's excessive-force claim.

### C. Unreasonable Search.

Wagoner asserts a claim for an unreasonable search in violation of the Fourth Amendment. This claim derives allegations that Ockunzzi searched Wagoner despite Wagoner requesting to be searched by a female officer and that Ockunzzi searched Wagoner by "pulling her shirt up and her pants down." (Compl. ¶¶ 27, 65.) Wagoner also argues the search was unconstitutional because Ockunzzi lacked probable cause to search her. (*Id.* ¶ 65.)

Ockunzzi seeks summary judgment on Wagoner's claim because the record before the court does not establish an unconstitutional search. The court agrees. Some of Wagoner's allegations are unsupported by the record. Ockunzzi states he did not pull Wagoner's pants down. (Ockunzzi Decl. ¶ 22.) He also states he pulled Wagoner's shirt "above her waist in order to observe her belt line for potential weapons, but did not lift it further." *Id.* Under the circumstances, the search-incident-to-arrest doctrine justified Ockunzzi's search of Wagoner.

First, for the reasons stated previously, Ockunzzi had probable cause to arrest Wagoner. Next, Ockunzzi's lawful arrest of Wagoner allowed him to conduct a search incident to her arrest. An officer's authority to conduct a warrantless search "of the person of the arrestee" after a lawful arrest is clearly established. *United States v. Robinson*, 414 U.S. 218, 224 (1973). A search incident to arrest is justified by the officer's need to ensure an arrestee does not possess weapons or articles of escape. *United States v. Hudson*, 100 F.3d 1409, 1419 (1996). Here, the record shows Ockunzzi conducted a search of Wagoner's person to determine whether she possessed weapons. (Ockunzzi Decl. ¶ 22.) This search was well within the established exception to the warrant requirement of the Fourth Amendment for searches of an arrestee's person incident to a lawful arrest.

Wagoner also asserted a Fourth Amendment claim based on the cross-gender nature of Ockunzzi's search of Wagoner. The Ninth Circuit has yet to consider the issue of an arrestee's right to a same-gender pat-down search. The weight of authority suggests that an arrestee has no constitutional right to have a pat-down search incident to arrest performed by an officer of the same gender. *See, e.g.*, *Himes v. Enid Police Dep't*, No. CIV-15-1084-R, 2016 WL 2354478, at *2 (W.D. Okla. Mar. 30, 2016) (collecting cases), *report and recommendation adopted in part, rejected in part*, 2016 WL 1737137 (May 2, 2016). A non-emergency strip searches of prisoners by opposite-gender officers are unconstitutional. *Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1142–47 (9th Cir. 2011). Pat-down searches of clothed male prisoners by female officers, however, are constitutional. *Grummett v. Rushen*, 779 F.2d 491, 496 (9th Cir. 1985).

In light of the weight of authority holding an arrestee has no per se right against cross-gender pat-down searches and the holding in *Grummett*, the court concludes Ockunzzi's pat-down search of Wagoner did not violate the Fourth Amendment simply because of its cross-gender character. The

record does not show any other objectionable or offensive contact occurred during the search. Accordingly, the court grants Ockunzzi's motion for summary judgment on Wagoner's unreasonable search claim.

### D. Denial of Equal Protection.

Wagoner alleges the Officers violated the Equal Protection Clause of the Fourteenth Amendment by targeting her for her race and sexual orientation. The Officers seek summary judgment on this claim because the record does not support a finding of discriminatory intent. *See Ortega Melendres v. Arpaio*, 598 F. Supp. 2d 1025, 1037 (D. Ariz. 2009) ("[A] law enforcement officer's discriminatory motivations can give rise to a constitutional violation even where the unequal treatment occurred during an otherwise lawful criminal detention."). The court agrees. Wagoner's equal protection claim relies on factual assertions that the record does not support: the Officers following the Honda from the Q Center, comments evidencing hostility towards lesbians, and a lack of probable cause for the seatbelt violations. The only statement in the record evidencing potential discriminatory motivation is Gryphon's reference to Wagoner as a white male, when she is instead a black woman. (Wagoner Tr. 11/4–12/25.) It is unnecessary to determine whether Gryphon's statement alone evidences discriminatory intent sufficient to survive summary judgment, however. Gryphon did not initiate Wagoner's arrest — Ockunzzi did. The record does not support any discriminatory intent on Ockunzzi's part. Accordingly, the court grants summary judgment for the Officers on Wagoner's equal-protection claim.

### E. Punishment Without Due Process.

Wagoner's punishment-without-due-process claim depends on the same factual allegation as her assault claim — presence of blood and used toilet paper in the holding cell at North Precinct.

As with Wagoner's assault claim, the record does not support her factual allegation. The court grants summary judgment to Ockunzzi and Gryphon on Wagoner's punishment without due process claim.

### F. Violation of First Amendment.

Wagoner's First Amendment claim relies on allegations that the Officers' followed her and Lamar from the Q Center, and that the subsequent encounter had a potential chilling effect on her First Amendment rights to peacefully assemble and associate at the Q Center. The record establishes that the Officers did not follow Wagoner and Lamar from the Q Center. (Ockunzzi Decl. ¶ 5, Gryphon Decl. ¶ 6; Dow Decl. ¶ 5 & Ex. A.) Accordingly, there is no connection between Wagoner's encounter with the Officers and Wagoner's constitutionally protected activities at the Q Center. The City is entitled to summary judgment on Wagoner's First Amendment Claim.

### Conclusion

The court DENIES Defendants' motion to strike. (ECF No.77.) The court GRANTS Defendants' motion for summary judgment (ECF No. 52) as to all of Wagoner's claims. Wagoner's lawsuit is dismissed with prejudice.

IT IS SO ORDERED.

DATED this 31st day of May, 2017.

_____
/s John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge